IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| KEVIN JOHNSON,<br><br>        Plaintiff,<br><br>v.<br><br>VIRGINIA DEPARTMENT OF CORRECTIONS, DIRECTOR CHADWICK S. DOTSON, in his official capacity; CHIEF OF CORRECTIONS OPERATIONS A. DAVID ROBINSON, in his official and individual capacities; BETH CABELL, in her official and individual capacities; WARDEN KEMSY BOWLES, in his official capacities; WARDEN KEVIN MCCOY, in his individual capacity; SGT. MATTHEW BLAHA, in his individual capacity; SGT. BROOKS WALLACE, in his individual capacity; OFFICER SMITH, in his individual capacity; WARDEN RICK WHITE, in his official and individual capacity; HEALTH SERVICES ADMINISTRATOR D. TRENT, in his official and individual capacity; SENIOR MENTAL HEALTH CLINICIAN E. CREECH, in his official and individual capacity; MENTAL HEALTH CLINICIAN J. MONIHAN, in his official and individual capacity; and CHIEF OF SECURITY MAJOR JOHNNY HALL, in his official and individual capacity,<br><br>        Defendants. | Civil Case No. 3:24-cv-00080<br>The Honorable Henry E. Hudson |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff Kevin Johnson, an incarcerated activist in the custody of the Virginia Department of Corrections (VADOC), respectfully submits the following argument in support of his Motion for a Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 65.

# FACTS

Kevin "Rashid" Johnson is a 52-year-old prisoner of VADOC. The Declaration of Kevin Johnson is attached as Exhibit A, ¶ 1. His written work has appeared in outlets like The Guardian and PBS, and he has published two books. *Id.* at ¶ 3. Because of his writing about issues in VADOC, he has faced a long history of retaliation from prison officials. *Id.* at ¶¶ 4–6.

As of October 2023, Mr. Johnson was housed in Sussex I State Prison, south of Richmond. *Id.* at ¶ 2. This placement was significant to Mr. Johnson, as it provided him access to his health care providers at Virginia Commonwealth University, which were actively providing him radiation treatment for prostate cancer as well as treating other medical problems including chronic high blood pressure, lipidemia, and numerous conditions consistent with heart issues. *Id.*

On October 18, 2023, prison staff ordered Mr. Johnson to relocate to a new cell, one that had sat empty for the previous six months and had not been inspected for contraband prior to the relocation. *Id.* at ¶ 7. Hours later, in the middle of the night, a "Strike Force" team made up of officers across the state burst through the door, waking up Mr. Johnson and began to shake down his cell. *Id.* at ¶ 8. The investigator kept insisting that the Strike Team members "find something." *Id.* at ¶ 10. Eventually, Strike Team members claimed to find a professionally manufactured knife affixed to the underside of the cell door. *Id.* at ¶ 11. They treated it casually, passing it amongst themselves, not behaving as if it were part of a serious investigation. *Id.* The next day, officials informed Mr. Johnson that they would be relocating him to the solitary confinement unit, and another staff member informed him that the raid was an excuse to get rid of him because of his attempts to draw attention to the prison. *Id.* at ¶¶ 12–13.

On October 22, 2023, Mr. Johnson published an article on the planting of the knife in his cell, encouraging readers to call prison officials and object. *Id.* at ¶ 14. Shortly afterwards, prison officials told Mr. Johnson that he would be "stepped down" from solitary confinement back to

general population. *Id.* at ¶ 15.

Roughly four days after the publication, despite his already being returned to general population status, Mr. Johnson was emergency transferred to Red Onion State Prison, the state's supermax prison in southwestern Virginia, several hundred miles from Richmond. *Id.* at ¶ 18. Mr. Johnson was not provided with the hearing required by VADOC policy nor was he even eligible for the transfer because he was in general population. *Id.*

When Defendant Sergeant Blaha approached Mr. Johnson's cell as part of a special task force to perform the transfer, Mr. Johnson informed Defendant Blaha that Mr. Johnson had an order for oversized handcuffs in his medical file due to chronic edema in his wrists. *Id.* at ¶ 19. Defendant Blaha responded that he did not care about the order or believe that the order existed and if Mr. Johnson persisted in his requests, Blaha would assault him with pepper spray. *Id.* When Mr. Johnson tried to explain again, Defendant Blaha gassed him. Defendant Blaha then went to the unit's booth, got a bigger canister of pepper spray, and sprayed him again. *Id.* Other staff members intervened, removed Blaha from the unit, and assured Mr. Johnson he would have the opportunity to decontaminate before the transfer, but he never did. *Id.* at ¶ 20.

Upon arriving at Red Onion, Mr. Johnson again did not get a hearing on the transfer in violation of VADOC policy. *Id.* at ¶ 24. The prison also cut off his access to the kiosk terminals that he had used to publish his articles about prison conditions and to communicate with the outside world. *Id.* His friends and family were unable to register for in-person visitation. *Id.* He began having trouble sending and receiving mail, the other avenue he could use to publish articles and continue litigating lawsuits he had maintained pro se. *Id.* These limitations on communication were not done as part of any prison policy but in violation of prison policy. *Id.*

Mr. Johnson received visits from Defendant Warden Rick White on his first day in Red Onion and from Assistant Warden Dwayne Turner on his second day. *Id.* at ¶ 25. Both men tried

to dissuade Mr. Johnson from speaking out against the prison and assured him that they would be accommodating of him if he restrained himself from engaging in First Amendment activity critical of the prison. *Id.* Mr. Johnson refused to stop engaging in his First Amendment protected activity. *Id.* at ¶ 26. As a result, prison staff retaliated against him, including by placing him in a solitary confinement program with a minimum stay of two years. *Id.* at ¶ 29.

Mr. Johnson and several other prisoners began a hunger strike on December 26, 2023 to protest improper solitary confinement and retaliation. *Id.* at ¶ 30. Instead of protecting his health, the Hunger Strike Management Committee assigned to look after Mr. Johnson tried to "break" him. *Id.* at ¶ 32. On December 30, 2023, the water was shut off to his cell, making his cell unhygienic and leaving him without drinking water, and most of his property was seized including his Bible and prayer books. *Id.* at ¶ 33. On January 3, 2024, he was moved to the medical unit and the rest of his property was taken, including anything to write with or on and any changes of clothing. *Id.* at ¶ 35. His medical cell also lacked running water. *Id.* at ¶ 36. When he was driven to dehydration, he lapped up water from his dirty toilet bowl like a dog. *Id.* at ¶ 37. The temperature of his cell was kept at roughly 55 degrees to keep him freezing cold. *Id.* at ¶ 45. He went over two weeks without showering, over a month without brushing his teeth, and over a month without changing his clothes. *Id.* at ¶¶ 47–50.

On January 4, January 9, and January 19, Mr. Johnson was taken to the hospital because of severe dehydration and given intravenous fluids. *Id.* at ¶¶ 39–42. But Defendants' retaliation continued. He was no longer given access to his prescribed, on-hand medications including a muscle salve that reduced the pain and edema in his knees, an ointment for dry skin, and a hemorrhoid cream to treat the symptoms from the radiation treatment for his prostate cancer. *Id.* at ¶ 53. He also received no treatment for his prostate cancer or his heart-related issues. *Id.* at ¶ 54. He had no access to a telephone or tablet so he could not seek help. *Id.* at ¶ 55.

On January 24, 2024, Assistant Warden Turner told Mr. Johnson several times that he had created these problems for himself by insisting on engaging in First Amendment activity. *Id.* at ¶ 59. Defendant White and VADOC official Ross (now believed to be spelled as "Rosch") suggested the same. *Id.* at ¶ 60.

On January 26, 2024, VADOC took Mr. Johnson to court in Wise County to attempt an order to involuntarily "medicate" Mr. Johnson with a feeding tube. *Id.* at ¶ 61. The judge denied the order, holding that Mr. Johnson was competent. *Id.* He was then taken to VCU Medical Center (VCU) for a psychiatric evaluation, which determined the same. *Id.* at ¶ 62.

From VCU, VADOC took Mr. Johnson to Powhatan Medical Unit, a prison medical facility just west of Richmond, and placed him in the previously closed mental health unit alone. *Id.* at ¶ 63. He is guarded around the clock by members of the Strike Force, including three of the same guards who raided his cell in Sussex I. *Id.* Two prison officials visited him there and told him they did not care about his hunger strike and as soon as he started eating again they would send him back to Red Onion. *Id.* at ¶ 64. He was rushed to VCU Medical Center on January 29, February 3, February 4, and February 5, 2024, where he was ultimately informed that his medical situation was dire. *Id.* at ¶¶ 65, 67.

On February 7, 2024, Mr. Johnson was again rushed to VCU Medical Center, his eighth trip to the hospital in just over one month, and he was admitted for chest pains and severe dehydration. As of the time of filing, Mr. Johnson remains in VCU, where he is chained to the bed and continues to be guarded around the clock by Strike Force members, including at times Defendants Blaha and Smith. He can no longer keep water down, even when he tries to drink. He still has not had access to hygiene items or writing materials. He continues to fear that ending his hunger strike will mean that he is sent immediately back to Red Onion, where—in addition to his recent treatment—he was previously subjected to 14 years of solitary confinement and racialized

5

assaults and violence.

**ARGUMENT**

Mr. Johnson seeks a temporary restraining order to protect his life and constitutional rights pursuant to Federal Rule of Civil Procedure 65(b). *See, e.g.*, *Stuart Circle Par. v. Bd. of Zoning Appeals of City of Richmond, Va.*, 946 F. Supp. 1225, 1228 (E.D. Va. 1996) (granting a temporary restraining order preventing the City of Richmond from enforcing a law forbidding the feeding of the homeless to protect the religious liberty rights of Richmond churches who sought to do so). The Court applies the same four factors to determine whether a temporary restraining order or preliminary injunction is warranted: (1) the likelihood of success on the merits, (2) whether the movant will face irreparable harm in the absence of preliminary relief, (3) whether the balance of equities favors preliminary relief, and (4) whether an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009). A prohibitory temporary restraining order, seeking to maintain the status quo, is a less demanding standard than that for a mandatory temporary restraining order, which seeks to change it. *See, e.g.*, *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). All four *Winter* factors merit injunctive relief here.

**I.　　Mr. Johnson Is Likely to Succeed on the Merits.**[1]

　　*a) Mr. Johnson is likely to succeed on his First Amendment retaliation claim.*

Mr. Johnson is likely to succeed on the merits of his First Amendment retaliation claim. To prove such a claim, Mr. Johnson needs to show that: (1) he "engaged in protected First

---

[1] The Prison Litigation Reform Act requires that prisoners exhaust available administrative remedies before filing suit, but remedies are not available when prison officials thwart the prisoner's ability to successfully exhaust their administrative remedies, as occurred here. *See Ross v. Blake*, 578 U.S. 632, 643 (2016); Ex. A, ¶¶ 17, 56.

Amendment activity," (2) VADOC took actions that "adversely affected" him and would "likely deter a person of ordinary firmness from the exercise of First Amendment rights," (3) VADOC took those actions because of Mr. Johnson's First Amendment conduct, and (4) VADOC's actions will "generate more than a de minimis inconvenience." *Snoeyenbos v. Curtis*, 60 F.4th 723, 729–31 (4th Cir. 2023).

Mr. Johnson has long been a target of VADOC in retaliation for his First Amendment activity. Ex. A, ¶¶ 4-6. Recently, Mr. Johnson had his cell raided in the middle of the night, evidence planted in his cell, and was transferred to solitary confinement based on that planted evidence. *Id*. at ¶¶ 8-12. An officer admitted to Mr. Johnson that "the knife was planted and that officials at Sussex I were trying to get rid of [him]." *Id*. at ¶ 13. Mr. Johnson then published another article detailing the planting of the knife and naming key VADOC officials as individuals to reach out to with complaints. *Id*. at ¶ 14. And people did reach out. *Id*. at ¶ 16. He also submitted numerous grievances detailing the planting of the knife and other violations by the team that raided his cell. *Id*. at ¶ 17. Mr. Johnson's publishing of articles highlighting the poor conditions within VADOC's prisons and the treatment of prisoners in that system constitutes classic First Amendment activity, as does his use of the prison grievance procedure and legal system to "petition for the redress of grievances." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017).[2]

Days after the article was published, and in direct retaliation for it, Defendants transferred Mr. Johnson to the most restrictive prison in the Commonwealth—Red Onion. *Id*. at ¶ 18. This move violated VADOC Operating Procedures, a clear indication that the move did not have a nondiscriminatory purpose. *Id*. at ¶ 18. Because of the calls to VADOC administrators by

---

[2] This right is not extinguished by imprisonment. *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987)).

7

community members on Mr. Johnson's behalf, those administrators were aware of the transfer and endorsed it. *Id*. at ¶ 21. At Red Onion, Mr. Johnson was again placed in solitary confinement. He was afforded no hearing for this at either Sussex I or Red Onion. *Id*. at ¶ 23. To fully accomplish the retaliatory scheme, Defendants cut off Mr. Johnson's ability to publish articles about prison conditions and to communicate with those outside of Red Onion. *Id*. at ¶ 24. Again, this demonstrates the real purpose of these actions—to shut Mr. Johnson up.

Those actions more than satisfy the second element. The Fourth Circuit has held that placement in "administrative segregation 'could deter a person of ordinary firmness from exercising their First Amendment rights.'" *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000)). Similarly, while transfers between prisons are normally not "adverse action[s] upon which a retaliation claim may be based," a transfer "'can be an adverse action if that transfer would result in foreseeable, negative consequences to the particular prisoner.'" *Johnson-El v. Beck*, No. 3:11-cv-115, 2011 U.S. Dist. LEXIS 37582, *11 (W.D.N.C. March 25, 2011) (quoting *Hill v. Lappin*, 630 F.3d 468, 475 (6th Cir. 2010)). Here, the fact that Mr. Johnson was transferred across the state, to a higher-security prison with its attendant restrictions on liberty, and away from his medical providers and family, makes his transfer an adverse action. Mr. Johnson's high-risk medical status and need to be near VCU for his cancer treatment highlight the adverse nature of the transfer. Separately, as noted above, his placement in solitary confinement at Red Onion also constitutes an adverse action.

The third element, the causal connection, is clear here. The causation element "asks whether the considerations which animated the defendant's conduct were permissible or impermissible." *Martin v. Duffy*, 977 F.3d 294, 300 (4th Cir. 2020). To carry his prima facie burden of causation, Mr. Johnson must show "'(1) that the defendants were aware of his engaging in protected activity' and (2) 'some degree of temporal proximity to suggest a causal connection.'"

8

*Shaw v. Foreman*, 59 F.4th 121, 17 (4th Cir. 2023) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005)) (cleaned up).[3]

The motivations here were to stifle Mr. Johnson's speech, a clearly impermissible motive. Because of the public outcry to VADOC administrators, they were aware of Mr. Johnson's First Amendment activity. And the adverse actions taken by Defendants came shortly after Mr. Johnson exercised his First Amendment rights. In addition to the temporal connection, there are numerous facts that support the conclusion that Defendants were motivated by improper retaliatory animus.

As stated above, Mr. Johnson's ability to publish articles and communicate with the outside world was eliminated. Ex. A, ¶ 24. At Sussex I, he was told that officials were "trying to get rid of [him] and were tired of [his] efforts to draw attention to issues in the prison." *Id*. at ¶ 13. And in his first days at Red Onion, both the Warden and Assistant Warden told Mr. Johnson they "would be accommodating of [him] if [he] did not engage in First Amendment activity." *Id*. at ¶ 25. Another VADOC administrator asked Mr. Johnson to agree to be transferred out of state and "not to exercise [his] First Amendment rights" there. *Id*. at ¶ 57. The Warden and Assistant Warden at Red Onion again explicitly told Mr. Johnson that he would be placed in general population if he would stop his First Amendment activity. *Id*. at ¶ 58. According to Defendants, Mr. Johnson "created this problem" with his public statements. *Id*.

Lastly, it goes without saying that a transfer to a supermax prison eight hours away from

---

[3] At the Summary Judgment stage, causation for prisoner retaliation claims follows the traditional burden-shifting framework set out by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). *See Martin v. Duffy*, 977 F.3d 294 (4th Cir. 2020). Under that framework, if a prisoner establishes a prima facie case of retaliation, the prison officials can defeat the claim by proving, by a preponderance of the evidence, that they "would have reached the same decision . . . in the absence of the protected conduct." *Id*. at 299 (quoting *Mt. Healthy*, 429 U.S. at 283). However, this standard is not relevant at this early stage of litigation. Even if VADOC were to attempt to mount such a defense at this stage, the violations of their own procedures in transferring Mr. Johnson and placing him in solitary confinement demonstrate that VADOC would not have treated Mr. Johnson this way in the absence of his First Amendment activities.

his family and medical providers caused Mr. Johnson more than minor inconvenience. The placement in solitary confinement, with all its attendant deprivations, is also more than a minor inconvenience. Those harms, combined with the damages suffered in the raid of his cell, more than clear the harm element for this claim.

Mr. Johnson is likely to succeed on his claim that he was retaliated against by Defendants for exercising his First Amendment rights to utilize the prison grievance system and publish articles about his circumstances.

> b) *Mr. Johnson is likely to succeed on his Eighth Amendment claim for deprivation of a basic human need.*

Prisoners can establish an Eighth Amendment violation when they are deprived of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). A plaintiff may not merely complain about conditions in general being troubling but must identify a "specific deprivation of a single human need." *Wilson v. Seiter*, 501 U.S. 294, 305 (1991). Warmth is, of course, such a need. *Id.*; *see also Walker v. Schult*, 717 F.3d 119, 127-28 (2d Cir. 2013). So is water. *Hope v. Pelzer*, 536 U.S. 730, 747–48 (2002) (endorsing Fifth Circuit precedent "suggest[ing] that it would be unconstitutional to inflict gratuitous pain on an inmate (by refusing him water) when punishment was unnecessary to enforce on-the-spot discipline"); *see also Scinto v. Stansberry*, 841 F.3d 219, 231 (4th Cir. 2016) (holding that a prisoner stated an Eighth Amendment claim when "the flow of water to Plaintiff's unit was discontinued because maintenance workers were repairing the unit's showers," resulting in him getting sick).[4]

---

[4] And, even if this Court determines that those deprivations alone are not sufficient (which, Plaintiff asserts that they are), the Supreme Court has held that multiple individual deprivations can combine and constitute one single experience of deprivation that rises (or sinks) to the level of unconstitutionality. *See Wilson*, 501 U.S. at 305. In 2020, for example, the U.S. Supreme Court summarily reversed the Fifth Circuit for holding that prison officials keeping a prisoner in a cold cell covered in human sewage for six days was unconstitutional, but not obviously so for purposes of qualified immunity. *Taylor v. Riojas*, 592 U.S. 7, 8 (2020). The Court held that the constitutional violation was indeed obvious. *Id.* While the defendants' conduct in *Taylor* was egregious,

VADOC's treatment of Mr. Johnson violates contemporary notions of decency. The record here demonstrates deprivation of water so dire that Mr. Johnson has been repeatedly hospitalized for dehydration. Ex. A, ¶¶ 33; 35–37; 39–42; 64. It further shows his cell kept at a cold temperature to try to "break" him from his hunger strike. *Id.* at ¶ 45. Mr. Johnson was also deprived of basic hygiene materials, *Id.* at ¶ 50, which courts have found satisfies the objective prong. *See Brooks v. Powell*, 800 F.3d 1295, 1304 (11th Cir. 2015) (collecting cases on hygienic facilities); *see also Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) (access to toiletries in particular). These deprivations are objectively serious enough to implicate the Eighth Amendment and have "resulted in serious or significant physical or emotional injury" to Mr. Johnson. *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). And they continue to cause more injury.

Defendants must also be found deliberately indifferent to this deprivation. *See Farmer v. Brennan*, 511 U.S. 825 (1994) (explaining the *mens rea* standard for conditions of confinement claims as deliberate indifference, or the knowing disregard of a substantial risk). This mental state can be demonstrated through circumstantial evidence. *Id.* at 842. The record here, however, shows not indifference but intention, a higher *mens rea* standard than required. Defendants intentionally deprived him of water, warmth, and hygiene as retaliation for First Amendment activity. The Defendants knew that such actions "might cause harm" to Mr. Johnson. *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017). In fact, that was the very point of the retaliation.

For the reasons stated above, Mr. Johnson is likely to succeed on these First Amendment and Eighth Amendment claims.

## II. Mr. Johnson Will Suffer Irreparable Harm Without an Injunction.

Mr. Johnson need only demonstrate that irreparable harm "is likely in the absence of an

---

Johnson's treatment has lasted much longer, is driven by the particularly threatening motive of deterring First Amendment activity, and is far more dangerous.

injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). A harm need not be inevitable or have already happened for it to be irreparable; rather, imminent harm is also cognizable harm that merits an injunction. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993).

The record establishes that Mr. Johnson is incredibly ill and at risk of death because of Defendants' retaliation and failure to provide the basic necessities of life. If Defendants continue to retaliate against him, he very likely risks serious illness and death, the archetypical irreparable harm. Ex. A, ¶¶ 33; 35–37; 39–42; 64.

Defendants' violations of Mr. Johnson's constitutional rights also constitute irreparable harm aside from the specific physical harms that they cause. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (extending the holding of *Elrod* to the violation of constitutional rights writ large).

### III. The Balances of Equities

The balance of equities is decisively in favor of Mr. Johnson, and a temporary restraining order is in the public interest. When the defendants are governmental actors, these two factors merge and are properly considered together. *Roe v. Dep't of Defense*, 947 F.3d 207, 230 (4th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Mr. Johnson has an interest in staying alive. He also has an interest in drinking water, in living in a cell with a bearable temperature, in not being sprayed with gas without provocation, in not being transferred to long-term solitary confinement, and in being able to speak with his family and friends through in-person visitation and the prison's digital messaging. More fundamentally, he has an interest in exercising his First Amendment rights without fear of severe reprisal. *See Elrod*, 427 U.S. at 373 (explaining this principle when the reprisal was threatened firing from a

public job).

By contrast, Defendants have no interest in depriving Mr. Johnson of water, spraying him with pepper spray unprovoked, or housing him in unnecessarily restrictive and punitive settings. Indeed, the Fourth Circuit has held that government defendants cannot have any interest in engaging in unconstitutional conduct. *See Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). As a result, preliminary relief that "uphold[s] constitutional rights surely serves the public interest," rather than undermining it. *Bason*, 303 F.3d at 521.

The public interest is also served by prisoners being able to exercise their free speech rights, however limited by the fact of incarceration, without threat of punishment. Members of the general public, the judiciary, policy makers, and VADOC officials themselves all rely on the ability of incarcerated people to exercise their constitutionally protected rights to speak, file grievances, and file lawsuits. *See Woodford v. Ngo*, 548 U.S. 81, 102 (2006) ("Corrections officials concerned about maintaining order in their institutions have a reason for creating and retaining grievance systems that provide—and that are perceived by prisoners as providing—a meaningful opportunity for prisoners to raise meritorious grievances"). Information on what is occurring inside Virginia's prisons, otherwise difficult to obtain given their status as inherently closed environments, is necessary for democratic accountability mechanisms to function. Individual staff members retaliating against prisoners for constitutionally protected actions—threatening their wellbeing, health, and even lives—undermines their ability to raise these critical concerns.

## CONCLUSION

Mr. Johnson respectfully requests that this Court grant Mr. Johnson a Temporary Restraining Order as detailed in his Motion and Proposed Order.

Dated: February 9, 2024                    Respectfully submitted,

*/s/ Mark J. Krudys*
Mark J. Krudys (VSB# 30718)
Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
Truist Place, 919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
mkrudys@krudys.com
dzemel@krudys.com

*/s/ Miriam R. Nemeth*
Miriam R. Nemeth*
Samuel Weiss**
RIGHTS BEHIND BARS
416 Florida Avenue, NW #26152
Washington, D.C. 20001
miriam@rightsbehindbars.org
sam@rightsbehindbars.org

*Attorneys for the Plaintiffs*

*Admitted pro hac vice
**Pro hac vice application forthcoming

## Certificate of Service

I hereby certify that on this 9th day of February 2024, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing (NEF) to all counsel of record.

By: /s/ *Mark J. Krudys*
 Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
Truist Place, 919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
mkrudys@krudys.com
*Counsel for Plaintiff*