IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KEVIN JOHNSON,                                                    Plaintiff,
v.         Case No. 3:24-cv-00080-HEH
VIRGINIA DEPARTMENT OF CORRECTIONS, et al.,        Defendants.

### MOTION FOR CONTEMPT

Plaintiff pro se pursuant to 18 U.S.C. § 401(3) and this court's inherent power moves for contempt citations against defendants, defense counsel and non-parties whose names and addresses are give below, as follows:

### NON-PARTY CONTEMNORS HEREIN

<u>Joel Anderson</u>, Director, South Carolina
         Department of Corrections (SCDC)
<u>Willie Davis</u>, Regional Director, SCDC
4444 Broad River Rd.
Columbia, SC 29221



&

<u>Curtis Earley</u>, Warden, Perry Correctional
         Institution (PCI)
<u>Joseph Werts</u>, Associate Warden, PCI
PCI
430 Oaklawn Rd.
Pelzer, SC 29669

### STATEMENT OF FACTS

1. On May 1, 2025 Plaintiff was transferred to SCDC under color of Virginia's Interstate Corrections Compact (ICC), Va. Code § 53.1-216, and corresponding South Carolina ICC law, SC Code § 24-11-10 [1] and the December 4, 2024 Settlement Agreement (SA) entered in this case. The SA specifically integrated § 53.1-216 and Virginia law into its terms as its enforcing authorities;

---

1. Both Va. Code § 53.1-216 and SC Code § 24-11-10 share identical language

see SA ¶¶ 2 and 6. Said SA attached hereto as Exhibit A.

2. On December 20, 2024 the court dismissed this case but retained jurisdiction to enforce the SA.

3. Defendants, defense counsels and the non-parties named above have already materially breached the SA as set out in the Plaintiff's verified Motion for Emergency Hearing on Defendants' Breach of Settlement Agreement, filed on June 2, 2025 (ECF #98).

4. Upon his SCDC assignment plaintiff was thrown into inhumane solitary confinement housing, first at SCDC's reception institution Kirkland Correctional Institution, then at PCI, where he remains confined. Plaintiff will detail below the conditions in SCDC's solitary confinement units, euphemistically called Restrictive Housing Units (RHU).

5. On May 5 and May 7, 2025 plaintiff met in person with the above-named non-party contemnors Curtis Earley (Earley) and Willie Davis (Davis), who preside over operations at PCI. Davis is second in authority over SCDC. During this meeting the SA was discussed of which both Earley and Davis confirmed their knowledge. Both informed plaintiff that according to the requirements of ¶ 15 of the SA and their duties as agents of the Virginia Department of Corrections (VDOC), plaintiff would be continued in single cell housing so long as he remained confined in SCDC. Also that Joel Anderson (Anderson) held to the same commitment. Subsequently on May 13, 2025 plaintiff was placed in General Population (GP) at PCI in a single cell.

6. On May 20, 2025 plaintiff was returned to RHU as stated in ECF #98, where he remained until July 14, 2025. On July 14 he was returned to GP and given a single cell.

7. On July 18, 2025, following plaintiff's having written and published several articles critical of conditions in SCDC and PCI and of Earley and Davis, Earley and Joseph Werts (Werts) summoned plaintiff into an office with Earley, Werts and two menacing guards. At that time Earley told plaintiff that his single cell status ~~preservation~~ was being revoked and if plaintiff disliked this decision and being housed in a cell with someone else, the two menacing guards would "be happy" to put him back in RHU, which Earley then had the two guards do. The RHU confinement was stated to be ~~about~~ upon the agreement of Anderson, and to continue indefinitely in SCDC.

8. In RHU Earley and Werts had all of plaintiff's stationery taken so he couldn't write the courts, along with defendants' recently filed response to plaintiff's motion to compel production of Documents and Things, and a composition book of his notes and work product related to this case and others.

- 2 -

9. Conditions in SCOC and PCI's RHU consist of the following: Inmates are confined inside small empty single occupancy cells for 24 hours per day. The cells are about half the size of a parking space. The inmates in RHU generally receive no outside exercise. When exercise is given - generally no more frequently than once per month if that - the inmates are placed in a single-man cage no larger than the cell that looks like a dog kennel. The cage has nothing inside it, no exercise equipment, etc. In RHU inmates may have no personal property, except legal papers; no canteen purchases are allowed, not even for personal hygiene items or stationery. The only hygiene items permitted are state-issued soap, toothpaste, toothbrush and a generic deodorant that provides no protection. Often these items are unavailable. Hair grease, combs, brushes, etc., are not allowed. There are no educational nor vocational programming allowed in RHU, no jobs are available. No access to congregate or religious programming. No personal books are allowed except one religious text. No periodicals. If any books or periodicals are received by mail, even as part of a subscription ordered before RHU placement, the materials are confiscated and disposed of or returned to sender with no refunds. The same is done with incoming personal mail containing internet materials or prints of articles. Plaintiff has had dozens of letters rejected simply because they were typed up upon false claims that they were internet materials or articles. Essentially, RHU inmates sit idle in the cells with nothing to do and no fresh air. The cells admit no natural outside light and have no view to the outside. RHU inmates must undergo strip and visual body cavity searches any time they leave their cells and are placed in multiple sets of handcuffs (3 pair) that typically cut into the wrists causing swelling and lacerations, along with leg shackles. RHU inmates seldom receive supplies with which to clean their cells.

10. Also in RHU, the cells are left completely dark at night, there are no in-cell lights accessible at night, making reading impossible at night. In the completely dark cells vermin, including stinging ants, spiders, huge cockroaches from the drains and showers, and mice crawl on and around the inmates, stinging and biting them.

11. In some RHU cells that plaintiff has been housed in, there are no bunks. One basically sleeps on the floor - on a concrete platform that sits about 6 inches above floor level. When it rains, water leaks onto the concrete platform through cracks in the cells' rear windows, which are painted over in dark grey so they admit no natural light, and

- 3 -

collects in puddles on the concrete platform - even flooding some cells - causing one's bedding to become water-saturated.

12. In RHU there are no desks nor writing surfaces nor sitting surfaces inside the cells. The cells contain only a metal combination toilet/sink unit. The cells have two doors sitting one behind the other, an inner barred door and an outside solid steel door with a glassed-in window that is covered with a heavy gauge steel mesh. There is also a slot on the solid door that remains bolted shut with a padlock on it, through which meals are passed and handcuffs are applied and removed. In RHU inmates may make no more than one 20 minute phone call per month. Plaintiff is housed on a non-communication cellblock where inmates may not use the phone at all, for reasons stated in ECF # 98.

13. Inmates have remained under these conditions in RHU for years, many with no disciplinary infractions and no meaningful review. In the cases of those who challenge RHU confinement, they often receive fabricated infractions to speciously justify continuing to confine them in RHU.

Plaintiff swears to the truth of the foregoing facts under penalty of perjury.

### BRIEF IN SUPPORT

Federal courts retain jurisdiction to enforce settlement agreements and parties are obligated " to comply with the terms of the settlement agreement [where the settlement has] been made part of the order of dismissal. either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order. In that event, a breach of the agreement would therefore be a violation of the order ...." Kokkonen v. Guardian Life Ins., 511 U.S. 375, 380 (1994).

Under 18 U.S.C. § 401(3) and this court's contempt power, federal courts may cite for contempt anyone who defies its known orders. NLRB v. Deena, 261 F.2d 503 (6th Cir. 1958); Baumrin v. Cournoyer, 448 F. Supp. 225 (D.C. Mass. 1978) (disobedience of order punishable by contempt). Disobedience of consent decrees and settlement agreements enforced by orders, even upon mutual agreements reached between the parties, are punishable by contempt. Usery v. Chef Italia, 540 F. Supp. 587 (E.D. Pa. 1982); Delaware Valley v. Comm. of Pa., 533 F. Supp. 869 (E.D. Pa. 1982). Such contempts may be adjudicated after dismissal of a settled case. Bradley v. American Household, 378 F.3d 373, 380 (4th Cir. 2004)("we do not exclude the

- 4 -

possibility that [contempt] sanctions of some sort may be necessary in some cases to ensure the proper functioning of judicial process notwithstanding a negotiated settlement agreement."). Moreover, orders must be obeyed even if they are later overturned. N. Am. Coal v. Loc. Union, 497 F.2d 459, 465 (6th Cir. 1974)(citing United States v. United Mine Workers, 330 U.S. 258 ((1947) and Gompers v. Buck's Store, 221 U.S. 418 (1911)).

In this instance, the defendants, defense counsel and the non-party contemnors have materially breached and defied the court ordered SA, as set out in ECF # 96 and in this instance of revoking his acknowledged entitlement to single cell housing in GP after initially honoring it. Also in putting him in facially illegal solitary confinement housing.

As the SA states in ¶¶ 2 and 6 it incorporates Va. Code § 53.1-216 and states further that the SA "shall be interpreted, construed and enforced in accordance with the laws of the Commonwealth of Virginia. [And this] Agreement shall not be construed with a presumption against the Party causing this Agreement to be drafted." In any case, courts must never "presume [one's] acquiescence in the loss of fundamental rights." Johnson v. Zerbst, 304 U.S. 458, 464 (1938).

In that plaintiff's confinement in SCOC is under the SA, defendants, their counsel and the non-party contemnors are liable in contempt for its violation. As for the non-parties, "persons not parties to the litigation before the court, and not holding official positions, requiring them to yield obedience to the court in their official conduct, can be punished in proceedings for contempt... for willfully resisting the execution of the lawful process or commands of the court." U.S. v. Jose, 63 F. 951 (C.C. Wash. 1894).

It is well settled that SA are to be construed by the law of contracts. In re Stokes, 198 B.R. 168, 175 (E.D. Va 1996); Montalla v. Comm., 303 Va. 150 (2024)( a settlement agreement is a contract). Again, the SA specifically implements § 53.1-216 and Virginia laws in its interpretation, construction and enforcement. See, SA @ ¶¶ 2 and 6. "Where a contract implements or fulfills a statutory requirement, the interpretation of the contract will be guided by the underlying statute." Dalles v. U.S., 82 Fed. Cl. 346, 355 (2008). "One of the basic rules of construction of contracts is that the law in force at the date of making the contract determines the rights of the parties under the contract. The law effective when the contract is made is as much a part of the contract as if incorporated therein." Paul v. Paul, 214 Va. 651, 653 (1974).

§ 53.1-216, Article IV (a) makes clear that SC as the "receiving" state of plaintiff under ICC, is the "agent" of VDOC, and as such the VDOC has total authority and control over SCDC under the principal and agent relationship, and plaintiff has all the same rights in SCDC custody as he would and did have in VDOC custody. See, Id, @ Article IV (e). The very nature of the pricipal/agent relationship, which is here created by law, is the principal's power of control over the agent, and both are liable to third parties for injuries caused by the agent. Miller v. Quarles, 242 Va. 343, 347 (1991).

Here the non-party contemnors were not just aware of plaintiff's rights under the SA, in particular to the single cell housing status in GP, but they initially enforced it. Their recent revocation of this status and throwing plaintiff into torturous RHU housing as punishment and retribution for his seeking to have his single cell GP status upheld was a willing breach of the SA and its court ordered authority, on top of the continued denial of legal property and other rights protected by the Virginia Constitution's due process and other provision which are binding on the SA.

Although, the contemnor's intentions are irrelevant in civil contempt proceedings, wrongful intent and illegal acts further corroborate the contemptuous nature of the acts. Here, the contemnors subjected plaintiff to conditions that are not just illegal and wrong but, facially unconstitutional. Plaintiff in referring to the conditions in the SCDC and PCI RHU, which amounts to torture.

In assessing the objective and subjective standards that must be met to find prison conditions in violation of the 8th Amendment's ban on cruel and unusual punishment, the 4th Circuit has found conditions of solitary confinement far less extreme than in SCDC's RHU unconstitutional. See, for example Porter v. Clarke, 923 F.3d 348 (4th Cir. 2019). In Porter, Virginia death row prisoners, were held under solitary confinement conditions, where unlike plaintiff in SCDC's RHU, they enjoyed privileges that SCDC RHU inmates and plaintiff do not, such as in-cell desks, windows admitting natural light, outside exercise and fresh air five days per week for an hour each day, personal property including televisions and disc players, and access to unlimited phone calls daily from 8am through 9:30 pm.

The Porter court stated, based upon now widely

available and well-known empirical evidence (scholarly mental health studies of the effects of solitary confinement), of which this court may take judicial notice, "that solitary confinement poses an objective risk of serious physical and emotional harm to inmates, and therefore can violate the Eighth Amendment." As to the conditions on Virginia's death row, which again were far less extreme than SCDC's RHU, the 4th Circuit ruled, "[t]he challenged conditions of confinement on Virginia's death row – under which plaintiffs spent, for years, between 23 and 24 hours a day alone, in a small cell with no access to congregate religious, educational, or social programming – pose a substantial risk of serious psychological and emotional harm." Id. @ 357. Plaintiff in this case is being held under these same conditions and far worse in solitary indefinitely because the contemnors wish to defy the SA's commitment to house him in a single cell in GP.

As for the subjective component of the Eighth Amendment, which requires a showing of "deliberate indifference," the Porter court again found that the much milder Virginia death row conditions were so excessive that the risk of harm was obvious to the prison officials, even without specific evidence of actual injury to the prisoners or their need to formally notify officials of any injuries suffered. The court stated, "the extensive scholarly literature describing and quantifying the adverse mental health effects of solitary confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm is so obvious that it had to have been known. Given the [state] Defendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction [in this case] could cause." Id. @ 361. The Porter court found the conditions on Virginia's death row were unconstitutional as in violation of the Eighth Amendment. Clearly, the far more egregious conditions in SCDC's RHU are unconstitutional, under which they have plaintiff confined. Indeed, the Porter court found from extensive psychological studies that such solitary conditions lasting longer than 10 days have consistently shown to "result in negative psychological effects." Id. @ 356. (emphasis in original.)

The contemnors herein, defendants, their counsel and the non-parties are clearly liable for contempt of court.

- 7 -

Contempt proceeding is summary in character, and technical pleadings are not required, it is sufficient if by motion/petition or other verified showing, it is made to appear that there has been a willful violation of court order, to which the contemnor may file an answer. <u>MacNeil v. U.S.</u>, 236 F. 149 (1st Cir. 1956).

THEREFORE, this court should have the non-parties named herein, defendants and defense counsels cited summarily for civil contempt if they cannot show cause against such citing and impose fines on them payable to plaintiff of $2000 per day that he is held in RHU, compel them to return him to GP in VDOC's Keen Mountain Correctional Center and return all his property to him, or have him placed at a VDOC institution in the VDOC's central or eastern region and return him to all of his property and such further relief as this court finds fair and just including instituting criminal contempt proceedings against them.

Respectfully submitted,

_____
Plaintiff pro se

Reply to: Kevin Johnson, No. 397279
Perry Correctional Institution
430 Oaklawn Rd.
Pelzer, SC 29669

<u>CERTIFICATE</u>

I hereby certify under penalty of perjury that I did mail a true copy of this Motion for Contempt by placing it into care of custodial officials for mailing postage prepaid on this 27th day of July 2025 to Clerk, US District Court, 701 E. Broad St., Richmond, VA 23219; to Joel Anderson, Director, Willie Davis, Regional Director, and General Counsel, SCDC, 4444 Broad River Rd., Columbia, SC 29221; to Curtis Earley and Joseph Werts, Wardens, PCI, 430 Oaklawn Rd., Pelzer, SC 29669; and notice to all counsels.

_____
Plaintiff pro se

- 8 -